IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNIVERSITY OF WISCONSIN HOSPITALS
AND CLINICS AUTHORITY and
UNIVERSITY OF WISCONSIN MEDICAL
FOUNDATION, INC.,

                     Plaintiffs,

v.

KRAFT FOODS GLOBAL, INC. RETIREE
HEALTH AND LIFE BENEFITS PLAN,

                     Defendant.

OPINION AND ORDER

14-cv-805-wmc

---

By way of an assignment of rights under an employee welfare benefits plan sponsored by defendant Kraft Foods Group, Inc. Retiree Health and Life Benefits Plan ("the Plan"),[1] plaintiffs University of Wisconsin Hospitals and Clinics Authority ("Hospital") and University of Wisconsin Medical Foundation, Inc. ("Foundation") challenge the Plan Administrator's denial of payment of claims related to a hip surgery.[2] Before the court are the parties' cross-motions for summary judgment under § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), which turn on the reasonableness of the administrator's determination that the Plan's insured may have responded to more conservative treatment options. Because of the deference due that determination and plaintiffs' failure to meet its burden of proving otherwise, the court will grant summary judgment to defendant.

---

[1] Defendant clarifies that it was incorrectly named as "Kraft Foods Global, Inc. Group Benefits Plan" in the amended complaint (dkt. #20), which has now been corrected as captioned above.

[2] The Plan does not challenge plaintiffs' right to stand in the shoes of its insured.

UNDISPUTED FACTS[3]

**A.      Relevant Plan Provisions and Terms**

The Plan was established by Kraft Foods Global under a negotiated employee health insurance agreement and is governed by ERISA.  At all times relevant to this lawsuit, Aetna Life Insurance Company ("Aetna") served as the claims administrator of the Plan for claims and appeals concerning medical coverage.  The Plan gives the claims administrator "full discretionary authority over benefit determinations for benefits it offers" and provides that benefits "will be paid only if the plan administrator or the claims administrator decides in its discretion that under the terms of the [Plan] the applicant is entitled to the benefit."

The Plan covers "only those services and supplies that are medically necessary and included in [the insured's] benefits summary."  "Medically necessary" is defined in the Plan as:

> health care services, and supplies or prescription drugs that a physician or other health care provider, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that provision of the service, supply or prescription drug is:
> a)      In accordance with generally accepted standards of medical practice;
> b)      Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease; and
> c)      Not primarily for the convenience of the patient, physician or other health care provider; and

---

[3] Unless otherwise noted, the court finds the following facts as taken from the parties' submissions to be material and undisputed.

> d)     Not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease.

(Administrative Record (dkt. #29-1) 193 [hereinafter "AR"].)

The Plan also provides that procedures that are "experimental" or "investigational" are excluded from coverage.  The plan includes a specific definition of those terms as well:

> "experimental" or "investigational" means drugs, tests, devices or procedures such as those that are being studie[d] for safety, efficiency and effectiveness; and/or are awaiting endorsement by the Food and Drug Administration (FDA) and the American Medical Association's Council of Medical Specialty Societies (AMA) for general use by the community at the time they are given to a covered person.  If a drug, test, device or procedure is not rated by the FDA and/or AMA, the claims administrator will rely on the prevailing medical opinion regarding the experimental or medical standards status of the drug, test, device or procedure as found in the commissioned studies, opinions or references of the medical associations or federal government agencies that have the authority to approve medical testing of the drug, test, device or procedure.

Finally, in the event of an adverse claim determination, the Plan states:

> Each level of appeal by the claims administrator will be conducted by an appropriate named fiduciary of the Retiree Medical Plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal nor a subordinate of such individual.  Each level of review will take into account all comments, documents, records and other information you submit relating to your claim, regardless of whether such information was submitted or considered in the prior levels of review and will not afford deference to the prior adverse benefit determinations.  If your appeal involves a decision that was based in whole or in part on a medical judgment, including a determination regarding whether a particular treatment, drug or other item is experimental, investigational, or not medically necessary or

3

appropriate, the claims administrator will consult with a health care professional who has the appropriate training and experience in the field of medicine involved in the medical judgment.   Such health care professional will not be an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal or a subordinate of such individual.   If the claims administrator obtained the advice of any medical or vocational expert in connection with your appeal, the decision on review will provide for the identification of such experts, regardless of whether the claims administrator relied on the advice in making the benefit determination.

The Plan guarantees a claimant two levels of appeals, stating that "[a]fter the second level of appeal . . . you have completed the Plan's administrative appeals process."  (AR 207.) The Plan also informs claimants that they can file a civil action challenging a claim denial under ERISA after exhausting the Plan's administrative remedies.[4]

## B.   Initial Denial of Payment

On August 28, 2013, Dr. James Keene performed hip surgery on Plan beneficiary Colleen Barone, for femoro-acetabular impingement ("FAI").[5]   As Barone's assignee, Aetna submitted an Explanation of Benefits ("EOB") to the Foundation on September 12, 2013, indicating that Aetna was denying $9,317 in charges related to the surgery.

---

[4] On the record before this court, it appears the Hospital only pursued one level of appeal, while the Foundation appealed the administrator's decision through the second and final level.  The Seventh Circuit has not, however, treated ERISA's exhaustion requirement as jurisdictional.  *See Edwards v. Briggs* & *Stratton Ret. Plan*, 639 F.3d 355, 365 n.5 (7th Cir. 2011).  Because defendant has effectively waived its exhaustion defense after pleading it initially in answer to plaintiffs' amended complaint, the court considers both Foundation and Hospital's benefits claims on summary judgment.

[5] Also known as hip impingement syndrome, FAI "is characterized by hip pain felt mainly in the groin, and can result in chronic pain and decreased range of motion in flexion and internal rotation."  (AR 111.)  Although not something that could have been known at the time of surgery, the Foundation attached notes from Barone's clinic visit several months after the surgery stating that she was "doing a lot better with her hip pain[.]"  (AR 88.)

Two weeks later, Aetna submitted an EOB to the Hospital, also as Barone's assignee, declaring that Aetna was denying $10,648.80 in charges for the surgery.  Both EOBs stated:

> Charges for or in connection with services or supplies that are, as determined by us, considered to be experimental or investigational are excluded from coverage under the member's plan.  The member is not responsible for this charge, unless they agreed to be responsible for this charge in writing before the service or supply was given.  To obtain more information regarding coverage of this service, go to our website and enter the procedure code in the search field or go to NaviNet, select our plan, then "Claims", and "Code Editing, Clinical & Payment Policy Lookup".

(AR 156, 166-67.)

## C.  First Appeal

The Hospital appealed the denial of its claim as contemplated by the Plan on October 18, writing:

> We would like to request an appeal on behalf of the University of Wisconsin Hospital and Clinics (UWHC) for the partially denied claim for the procedure performed in August 2013 for Colleen Barone.
>
> Ms. Barone is a 56 y.o. woman with a history of left labral tear and pincer acetabular ostephyte.  On August 28, 2013, she had a left hip arthroscopy with excision of the labral tear as well as removal of the pincer acetabular lip osteophyte.
>
> As we understand it, Aetna has determined that the procedure was somehow experimental.  We are attaching two clinic notes (6/11/13 & 6/26/13) as well as the operative report to provide an explanation as to why the procedure was done.  Please have an orthopedic surgeon familiar with this type of injury review the notes and contact us if there are any questions.

In response to the Hospital's request for appeal, Aetna upheld its denial of payment. The notice of decision, dated December 3, 2013, explained that an "Aetna medical director" found Ms. Barone's procedure was ineligible for payment after reviewing the available information, including clinic notes and the operative report. That notice also set forth nine, independent criteria a patient must meet in order for Aetna to consider FAI surgery medically necessary, all of which are listed in Aetna's Clinical Policy Bulletin ("CPB") number 0736 for "Femoro-Acetabular Surgery for Hip Impingement Syndrome." In turn, the CPB itself references multiple studies, opinions and reports that Aetna consulted in developing these criteria.

In the course of evaluating the claim, Aetna actually relied on two largely identical versions of CPB 0736. One of the versions provides that:

> Aetna considers femoro-acetabular surgery, open or arthroscopic, for the treatment of hip impingement syndrome medically necessary for persons who fulfil[l] all the following criteria:
>
> - Diagnosis of definite femoro-acetabular impingement defined by appropriate imaging studies (X-rays, MRI or CT scans), showing cam impingement (alpha angle greater than 50 degrees), pincer impingement (acetabular retroversion or coxa profunda), or pistol grip deformity (nonspherical femoral head shape).
>
> - Severe symptoms typical of FAI (hip pain that is worsened by flexion activities (e.g., squatting or prolonged sitting) that significantly limits activities, with duration of at least six months where diagnosis of FAI has been made as above.
>
>     . . . .

6

> ▪ Failure to respond to all available conservative treatment options including activity modification (e.g., restriction of athletic pursuits and avoidance of symptomatic motion), pharmacological intervention and physiotherapy.
>
> ▪ Member is 15 years of age or older or skeletally mature (as indicated by epiphyseal closure) and 50 years of age or younger (clinical experience has shown that these patients are likely to gain the greatest benefit).
>
> . . . .
>
> Surgery for FAI impingement is considered experimental and investigational for all other indications.

(AR 110.)  The other version lists the same nine criteria, save for the requirement that a patient be no more than 50 years old.  Instead, the other CPB only requires a claimant to be "15 years of age or older or skeletally mature (as indicated by epiphyseal closure)." (AR 129.)

Both versions include additional detail about the requirement that patients seek conservative treatment before electing surgery:

> Management of individuals with FAI ranges from conservative therapies (e.g., modification of activities to reduce excessive motion and burden on the hip, the use of non-steroidal anti-inflammatory drugs, and discontinuation of activities associated with the painful hip movement) to surgery (e.g., peri-acetabular osteotomy, hip dislocation and debridement).  Conservative measures, including physical therapy, restriction of activities, core strengthening, improvement of sensory-motor, and control and nonsteroidal anti-inflammatories are the mainstays of nonsurgical treatment (Samora, et al., 2011).

(AR 111, 130.)

7

After listing the nine criteria from the version of the CPB that included the maximum age limit, the conclusion of the first notice of appeal denial described which criteria Ms. Barone failed to meet:

> The documentation provided fails to demonstrate a diagnosis of definite femero-acetabular impingement defined by appropriate investigations, X-rays, MRI and CT scans and failure to respond to all conservative treatment options including activity modification (e.g., restriction of athletic pursuits and avoidance of symptomatic motion), pharmacological intervention and physiotherapy.
>
> The member was 56 years old on the date of surgery.  This decision was made utilizing Aetna's Clinical Policy Bulletin (CPB) Femero-Acetabular Surgery for Hip Impingement Syndrome in effect for the date of service.  You may obtain a copy of this CPB by calling the number listed on the member's identification card.  Therefore, no additional payment will be made with respect to the above-listed case(s).

**D.  Second Appeal**

The Foundation appealed Aetna's denial on January 14, 2014, attaching additional clinic notes from Ms. Barone's medical records.  In a notice dated February 25, 2014, however, Aetna again denied the appeal.  (AR 74-75.)  This second notice referred to criterion from the version of the CPB that did *not* set an upper age limit for FAI surgery candidates.  That notice also offered an additional reason for denying payment:  the "documentation . . . fail[ed] to demonstrate severe symptoms typical of FAI (hip pain that is worsened by flexion activities (e.g., squatting or prolonged sitting) that significantly limits activities, with duration of at least six months where diagnosis of FAI has been made[.]"

The Foundation sent yet another letter with attached records in response to Aetna's second notice of denial. In this letter, a representative of the Foundation directly addressed with further documentation the two reasons Aetna listed for denial of its claim to reimbursement:

- A diagnosis of definite femeroacetabular impingement defined by appropriate investigations, X-rays, MRI and CT scans.

   Per documentation attached, MR Arthrogram showed labral tear and also relieved her hip pain. Plain x-rays showed an overhanging acetabular lip with a tonus angle of -4 degrees, a CE-Angle of 54 degrees and a positive crossover sign. All findings consistent with Pincer impingement. The patient did not have any pain relief with SI joint injection, but did respond to MR arthrogram/anesthetic injection suggesting that her pain was coming from her hip joint. She also had pain with sitting, and going from a seated to a standing position.

   Therefore, she was offered and elected to undergo arthroscopy and treatment of her labral tear and Pincer femeroacetabular impingement.

- Severe Symptoms typical of FAI (hip pain that is worsened by flexion activities (e.g., squatting or prolonged sitting) that significantly limits activities, with duration of at least six months where diagnosis of FAI has been made as above and fails to demonstrate failure to respond to all available conservative treatment options (including activity modification, pharmacological intervention and physiotherapy).

   Per documentation attached, the patient had SI joint pain for greater than one year. Patient initially saw Dr. Holz in December of 2012 at which time Dr. Holz documented that the patient ". . . **describes sitting, going from a seated to standing position, and turning will increase her pain the most.**" She notes that her pain goes from 1 to 6 and at its

> **worst is a 6/10.** She notes that the pain can be sharp with certain positions. Per the 12/06/12 Clinic Note by Dr. Holz, the patient initially tried a chiropractor which did not help. Then she has been doing physical therapy since September 2012. She eventually elected to stop therapy in December of 2012 "because she really was not sure if it was helping, and she had been doing it for so long."
>
> I have attached our medical records to show that this patient underwent a medically necessary procedure to treat long-standing hip pain that was resistant to conservative treatment. I have also included the patient's most recent clinic visit from 3/27/14 which shows that the patient is doing well and her symptoms have largely resolved.

(AR 77-78 (emphasis in original).)

In a notice dated May 22, 2014, Aetna denied the Foundation's second appeal for coverage. The reasons given for denial of coverage in this notice were nearly identical to those in the first, mentioning that the documentation failed to show a definite FAI diagnosis and no response to all conservative treatment options, except that it did not reference Ms. Barone's age. This third denial also included a notification that the Foundation had reached the final level of internal appeal.

## E.  Correspondence after Final Appeal

In a letter dated April 4, 2014, the Foundation responded to Aetna's finding that the documentation submitted with the claim lacked a definitive diagnosis of femeroacetabular impingement:

> Dr. Keene's documentation does support a diagnosis of Pincer Femeroacetabular Impingement. _Specifically, her radiographs clearly demonstrated Pincer acetabular impingement (an overhanging acetabular lip) with a positive cross-over sign and a negative Center-edge angle (-4). These criteria are all indicative of_

10

> *Pincer Femeroacetabular Impingement*.   The Radiology report does not document these findings because the Radiologist does not measure these criteria.   Dr. Keene does measure these criteria and this information is clearly documented in his clinic note and in the Pre-Op History and Physical.

(AR 18 (emphasis in original).)   The Foundation also disputed Aetna's conclusion that Ms. Barone failed to respond to all available conservative treatment options:

> Per documentation attached, the patient had SI joint pain for greater than one year.   Patient initially saw Dr. Holz in December 2012 at which time Dr. Holz documented that the patient ". . . describes sitting, going from a seated to a standing position, and turning will increase her pain the most."   Per the 12/06/12 Clinic Note by Dr. Holz, the patient initially tried a chiropractor which did not help.   In addition, documentation shows that she had been doing physical therapy since September 2012.   She eventually elected to stop therapy in December of 2012 "because she really was not sure if it was helping."   *Documentation (attached) shows that the patient failed to respond to all available conservative treatment options including activity modification (she stopped sitting), chiropractic manipulation, pharmacological intervention (anti-inflammatory medications), and doing physiotherapy for over one year*.

(*Id*. (emphasis in original).)

Several weeks later, Aetna sent the Foundation a letter indicating that it would need more time to review this new appeal.   On August 27, 2014, less than a week after plaintiffs' attorney sent a letter to Aetna demanding immediate payment for the procedure, Aetna sent the Foundation a final denial, noting that it had already completed a full review of the claim.

## OPINION

When a "benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," *Firestone Tire* &

11

*Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), courts must "review a denial of benefits deferentially, asking only whether the plan's decision was arbitrary or capricious." *Hess v. Reg-Ellen Mach. Tool Corp. Emp. Stock Ownership Plan*, 502 F.3d 725, 727 (7th Cir. 2007). Since the parties agree that the Plan at issue grants discretionary authority to the administrator, the court cannot overturn Aetna's denial of coverage for FAI surgery unless it is "downright unreasonable." *Id.* (citing *Cozzie v. Metro. Life Ins.*, 140 F.3d 1104, 1110 (7th Cir. 1998)). Although subject to substantial deference, the Seventh Circuit still advises that "deference need not be abject." *Gallo v. Amoco Corp.*, 102 F.3d 918, 922 (7th Cir. 1996); *see also Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010) (emphasizing that review under the arbitrary and capricious standard "is not a rubber stamp").

As a practical matter, this means that courts will uphold an administrator's decision if: "(1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass important aspects of the problem." *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001) (internal quotation marks omitted). Here, plaintiffs contend that Aetna's denial was arbitrary and capricious as to both procedure and substance. Accordingly, the court will address each in turn.

## I.  Procedural Challenges

Plaintiffs contend that Aetna failed to follow the claim review process required by the Plan and applicable ERISA regulations.  While "ERISA requires that specific reasons for denial be communicated to the claimant and that the claimant be afforded an opportunity for 'full and fair review' by the administrator," *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 688 (7th Cir. 1992) (quoting 29 U.S.C. § 1133), all that is necessary to meet this requirement is "substantial compliance."  *See Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 775 (7th Cir. 2003).  Ultimately, a finding of substantial compliance with procedure turns on whether the administrator provided the plan beneficiary and courts with "a sufficiently precise understanding of the ground for the denial to permit a realistic possibility of review, even under a deferential standard." *Halpin*, 962 F.2d at 693-94.  As set forth below, Aetna's actions certainly meet this minimum threshold.

### A.  Adequacy of the denial notices

Plaintiffs first challenge the adequacy of Aetna's written denial notices, arguing that the notices failed to sufficiently inform plaintiffs about how they could respond to the denials.  Under ERISA, the Plan is required to "provide adequate notice in writing . . . setting forth the specific reasons for [the] denial, written in a manner calculated to be understood by the participant[.]"  29 U.S.C. § 1133(1).  However, substantial compliance with § 1133 means that the Plan must give "the specific reasons for the denial, but it need not explain the reasoning behind the reasons, . . . [that is,] the interpretive process that generated the reason for the denial."  *Herman v. Cent. States, Se.*

13

*and Sw. Areas Pension Fund*, 423 F.3d 684, 693 (7th Cir. 2005) (alterations in original) (internal quotation marks omitted).

Plaintiffs contend that because the two notices included different reasons for denial, they could not discern what additional information they needed to provide to Aetna to substantiate their claims.  Plaintiffs further contend that the reasons Aetna did give were unsupported, making it difficult to respond.   In turn, Aetna essentially concedes that its notices were not entirely consistent, but points out that each of the three notices explain why Ms. Barone's FAI surgery was deemed ineligible for coverage.

Specifically, the notices explained that:  (1) "[t]he documentation provided fails to demonstrate a diagnosis of femoro-acetabular impingement defined by appropriate investigations, X-rays MRI and CT scans"; and (2) the documentation did not demonstrate "failure to respond to all available conservative treatment options including activity modification (e.g., restriction of athletic pursuits and avoidance of symptomatic motion), pharmacological intervention and physiotherapy."  Moreover, these two reasons mirror corresponding criteria set forth in *both* versions of Aetna's CPBs as well as *both* denial notices.  Finally, to the extent the notices Aetna sent to plaintiffs were not wholly consistent, they still complied substantially with the ERISA requirements that plaintiffs can understand and respond to the articulated reasons for the denial of coverage.  *See Gallo*, 102 F.3d at 923; *see also Bussey v. Corning Life Servs., Inc.*, No. 97 CV 8875, 2000 WL 91916, at *6 (N.D. Ill. Jan. 19, 2000) (holding that a denial letter that did not "specify what type of additional information would be necessary to perfect the claim and why such information would be necessary," nevertheless "complied with the specificity

14

requirements and purpose" of the ERISA regulations).   Indeed, given that plaintiffs responded to the notices by writing letters and providing documentation addressing those same reasons or concerns, the notices were obviously sufficient to inform plaintiffs about the reasons for the denials of coverage in a way that enabled them to respond adequately.

### B.    Adequacy of the Appeal Process

Plaintiffs also argue that Aetna improperly handled their appeals by failing to follow procedures set forth in the Plan itself.   More specifically, plaintiffs contend that Aetna denied them a full and fair review by failing (1) to consult with health care professionals or (2) to disclose the names of the health care professionals with whom it did consult.   Relatedly, plaintiffs argue that the CPBs developed by Aetna were insufficient to substitute for review by a health care professional.

Defendant counters by pointing out that each of the notices indicate an "Aetna medical director" reviewed plaintiffs' appeals.  Aetna argues that this disclosure is enough to refute plaintiffs' assertion that it relied exclusively on the CPBs in place of health care professionals, while nothing in the Plan required that it list the actual name of the medical professionals involved in the initial denial decisions.[6]  Even so, the admittedly incomplete administrative record seems to support a finding that Aetna did have medical professionals review plaintiffs' coverage claims, notwithstanding plaintiffs' speculation otherwise, and plaintiffs point to nothing in this record indicting that they made efforts

---

[6] The administrative record in this case includes names of individuals who *could* have been the medical professionals Aetna consulted in deciding plaintiffs' claim to coverage, but neither side points to anything conclusive.  On the other hand, plaintiffs could presumably have asked for this specific information during the administrative process.

to obtain more specific information during the administrative process, much less that Aetna thwarted those efforts.  Accordingly, there is no basis for the court to overturn Aetna's denial on this basis.

Even if Aetna relied -- contrary to its representation and the facts of record -- on the CPBs alone, this would not constitute a denial of a full and fair review by a medical professional.  Both versions of the CPB list the references Aetna consulted in creating them, and plaintiffs neither attack the reliability of those sources nor that the sources support the standards adopted.  Therefore, the court cannot conclude that Aetna's reliance on either version of the CPB was unreasonable.  *See, e.g., Quality Infusion Care Inc. v. Aetna Life Ins. Co.*, 257 F. App'x 735, 736 (5th Cir. 2007) (recognizing that "an insurer's reliance on a pre-published plan to determine what is medically necessary can be reasonable under ERISA") (internal quotation marks omitted).

Furthermore, Aetna's failure to disclose the individual names of the medical professionals it consulted in the notices sent to plaintiffs or relied upon in preparing the CPBs is not fatal, as the Plan only requires that "the decision on review will provide for the identification of such experts[.]"  *See also* 29 C.F.R. § 2560.503-1(h)(3)(iv) (guaranteeing the same under the ERISA regulations).  Since nothing in this record suggests plaintiffs ever requested the names of the medical professionals Aetna consulted, nor do plaintiffs even claim to have done so, Aetna cannot reasonably be faulted for not providing them. *See Edelman v. Roofers' Pension Fund*, No. 12 C 8221, 2014 WL 1660625, at *10 (N.D. Ill. Apr. 24, 2014) ("[N]othing in the ERISA regulations prohibits a plan from consulting with an unidentified reviewing physician.  Rather, the regulations simply

16

require plans to provide a procedure whereby participants can discover the [identity] of the reviewer[].") (second and third bracketed alterations in original) (internal quotation marks omitted).

## II.    Substantive Challenges

Plaintiffs also challenge the substance of Aetna's denial of payment, arguing the evidence before it compelled a finding that Ms. Barone's FAI surgery was medically necessary.   Here, defendant offers two reasons for denial of coverage: (1) the documentation failed to demonstrate a diagnosis of definite FAI after appropriate investigations; and (2) the documentation was insufficient to show that Ms. Barone failed to respond to all conservative treatment options.[7]   The court addresses each reason below.

### A.    Diagnosis of FAI

Even under the lenient standard of review applicable here, the court cannot uphold Aetna's first reason for denying coverage.   As an initial matter, plaintiffs responded to each of Aetna's denial notices by submitting additional medical records and letters supporting the treating physician's diagnosis of FAI.   Moreover, these submissions appear to respond adequately to each of Aetna's reasonable concerns regarding the diagnosis.   Most definitively, the records submitted underscore specific measurements

---

[7] In light of Aetna's apparent confusion as to which CPB applied to plaintiffs' claims, and perhaps out of recognition of the suspect nature of a denial of coverage on the basis of age alone, defendant effectively waives its other reason for denial as articulated in its formal notices:  that FAI surgery should be categorically denied on a patient over 50 years of age.

and findings in Ms. Barone's medical records that meet the criteria for an unambiguous diagnosis of FAI as listed in Aetna's notices *and* both versions of CPB 0736.

Unlike the social security setting, the Seventh Circuit has held that "ERISA does not require plan administrators to accord special deference to the opinions of treating physicians," *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 607 (7th Cir. 2007), but it is equally clear that plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician," especially in the absence of an explanation or contrary evidence. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003); *see also Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 397-98 (7th Cir. 2009) ("While plan administrators do not owe any special deference to the opinions of treating physicians, they may not simply ignore their medical conclusions or dismiss those conclusions without explanation.") (internal citation omitted).

Unlike the plan's denial in *Mote*, which was upheld because it "looked to, and credited, evidence that conflicted with [the] treating physicians' opinions as part of its deliberative process in evaluating [the] claim," defendant here neither offers, nor is it apparent from the record that there is, any evidence contradicting the treating physician's definitive diagnosis of FAI. 502 F.3d at 607. Accordingly, denying payment without further investigation appears both arbitrary and capricious. *See O'Reilly v. Hartford Life & Accident Ins. Co.*, 272 F.3d 955, 961 (7th Cir. 2001) ("Before denying benefits, administrators of ERISA plans are required to have enough evidence to allow them to make a reasonable decision. ERISA does not require a 'full-blown' investigation, but it

does demand a 'reasonable inquiry' into a claimant's medical condition and his vocational skills and potential.") (internal citation omitted) (quoting *Quinn v. Blue Cross and Blue Shield Ass'n*, 161 F.3d 472, 476-77 (7th Cir. 1998) (abrogated on other grounds by *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252-54, 130 S.Ct. 2149, 176 L.Ed.2d 998 (2010)).

If anything, defendant's insistence on plaintiffs' failure to submit the actual imaging studies (as opposed to the treating physician's written analysis of those studies) actually underscores that Aetna lacked any basis to contradict the objective medical evidence supporting a diagnosis of FAI. Consequently, the court cannot rubber stamp Aetna's first reason for denial absent a meaningful explanation as to why the medical records plaintiffs submitted were insufficient to demonstrate a diagnosis of FAI.

## B.    Conservative Treatment

As noted previously, each of three notices stated a second, independent reason for Aetna's denial of plaintiffs' claims: the documentation provided did not show that Ms. Barone had undergone or failed to respond to more conservative treatment options. Unlike the first reason, the court finds that "it is possible to offer a reasoned explanation" for this determination based on the record before it. *Hess*, 274 F.3d at 461. Since both versions of the CPB require that Ms. Barone meet *all* of the criteria listed in the CPB, this reason alone dooms her substantive claim under ERISA.

To begin with, plaintiffs do not challenge the requirements of the CPB as unreasonable on their face, no doubt because other courts have already recognized that "an insurer's reliance on a pre-published plan to determine what is 'medically necessary'

can be reasonable under ERISA." *Quality Infusion Care*, 257 F. App'x at 736 (citing *Dowden v. Blue Cross & Blue Shield of Tex., Inc.*, 126 F.3d 641, 644 (5th Cir. 1997)).

While the criterion requiring a claimant to show a "[f]ailure to respond to *all available* conservative treatment options" may be unsettlingly broad, even vague, it is nevertheless consistent with the Plan language defining which procedures are medically necessary.  More importantly, the explanation for the criterion gives it both boundaries and standards to apply it:  the Plan seeks to eliminate procedures done "primarily for the convenience of the patient" or before a patient explores a less costly "alternative service or sequence of services."  (AR 193.)  *Cf. Murray v. Int'l Busn. Machs. Corps.*, 557 F. Supp. 2d 444, 450 (D.Vt. Mar. 27, 2008) (upholding a plan administrator's "denial of coverage based on a lack of documentation of a failure of conservative treatments" as consistent with the plan's language and "accepted medical standards").  Indeed, other courts have also upheld a plan administrator's denial of payment based on a claimant's failure to establish that more conservative treatments were ineffective.  *See Burkitt v. NECA-IBEW Welfare Tr. Fund*, No. 09-1157, 2009 WL 3672322, at *3, *5 (C.D. Ill. Oct. 29, 2009) (refusing to find that an Aetna policy defining a service as medically necessary only if a patient could show that she underwent "an unsuccessful trial of conservative management . . . for a minimum of six months" was unreasonable); *Murray*, 557 F. Supp. 2d at 450 (upholding as reasonable an administrator's denial when "[t]he physician's letters written in support of [plaintiff's] claim contained only conclusory statements that conservative treatments merely provided [plaintiff] temporary relief; they did not document a 'failed adequate supervised trial of conservative treatments'").

20

With that said, the record before Aetna does chronicle a number of more conservative treatments that Ms. Barone had undergone *before* her FAI surgery, including: (1) chiropractic services, which were ineffective (AR 84); (2) an unspecified number of targeted injections and facet injections to her SI joint, which also proved ineffective (AR 87); (3) a hip injection producing inconclusive results because she took "an increased amount of time into the next day to repeat the typical activities that bothered her hip" (AR 86); (4) an anesthetic hip joint injection that relieved her pain from "a 1 out of 10 to 0 out of 10" (AR 93); and (5) an unspecified number of physical therapy sessions over the course of no more than three months despite a recommendation from one of her physicians that she continue with physical therapy (AR 78, 84).

Certainly, these efforts support a finding that Ms. Barone did not experience *success* with some (if not most) of the conservative treatment options she undertook. Still, without reaching the question of whether it would have been reasonable for Aetna to deny payment on the basis that Ms. Barone did not try enough, or other available, conservative treatment options, Aetna could reasonably conclude the documentation plaintiffs submitted failed to establish sufficiently that the conservative treatment options she tried were *ineffective*.[8]

---

[8] Although the record indicates that Ms. Barone may have been unusually active -- she apparently experienced pain related to her FAI after taking a motorcycle trip through Yellowstone National Park, complete with "a lot of on and off of the motorcycle itself" (AR 86) -- the court need not decide whether it was unreasonable for an administrator to assume that she could have avoided symptomatic motions if she felt pain while she was active, at least in light of the other reasons supporting Aetna's conclusion that Barone was responding to certain treatments and may have responded to others. *See* AR 84 (concluding that Barone was experiencing the most increased pain merely by "sitting, going from a seated to a standing position, and turning").

For example, the denial notices and the CPBs mention physical therapy/ physiotherapy as conservative treatment options that plaintiff failed to demonstrate were *ineffective*.  While Ms. Barone likely provided enough evidence to show that injections and chiropractic services she had tried were ineffective (and that she could not reasonably avoid at least some symptomatic motions) that is not so with respect to her physical therapy.  On the contrary, the record shows that:

- Barone began physical therapy in September 2012, but "elected to stop therapy in December of 2012 'because she really was not sure if it was helping, and she had been doing it for so long.'"  (AR 78.)

- Barone provided no notes from her physical therapy sessions, so the court does not know how many sessions she had or whether she was making any progress.

- Dr. Sara Holz of the UW Department of Orthopedics and Rehabilitation noted after seeing Ms. Barone on December 6, 2012, that:  (1) Ms. Barone "has been doing physical therapy since September and *just started with one of the spine therapists*" (emphasis added); and (2) Dr. Holz recommended that Ms. Barone "[c]ontinue with physical therapy."  (AR 84.)

Finally, to address plaintiffs' remaining argument, not only does it appear that plaintiffs' submissions to Aetna *after* receiving their third denial notice were still insufficient to establish that any additional conservative treatment options Ms. Barone tried were ineffective, but those submissions came too late given that the Plan does not contemplate, much less guarantee, a *third* level of appeals.  Thus, even though Aetna sent plaintiffs a notice indicating that it needed additional time to review this third, unauthorized appeal, that aberration in procedure did not deprive plaintiffs of a full and fair review.  *Cf. Militello v. Cent. States, Se. and Sw. Areas Pension Fund*, 360 F.3d 681, 690

(7th Cir. 2004) ("[W]e cannot say that failure to follow the appeal process to the letter, without more, necessarily deprived [plaintiff] of full and fair review.").[9]

## III.    Attorney's Fees and Costs

Defendant seeks recovery of the attorney's fees and costs it incurred in this case. Under ERISA, the court has the discretion to award fees and costs to a party if it has shown "some degree of success on the merits." *Hardt* 560 U.S. at 255.  Having prevailed on summary judgment, defendant has met this initial hurdle.

The Seventh Circuit has recognized two tests to assist courts in exercising this discretion.  *See Kolbe & Kolbe Health & Welfare Benefit Plan v. Med. Coll. of Wis., Inc.*, 657 F.3d 496, 505-06 (7th Cir. 2011).  Under the first test, the court analyzes: "1) the degree of the offending parties' culpability or bad faith; 2) . . . the ability of the offending parties to satisfy personally an award of attorney's fees; 3) whether or not an award of attorney's

---

[9] Although in no way dispositive, the court would be remiss not to point out that all of these uncertainties regarding coverage could have been avoided had plaintiffs pre-certified Ms. Barone's FAI surgery.  Plaintiffs' failure to do so here is particularly curious when the patient presented with a chronic condition rather than an emergency, and the long-term effectiveness of FAI surgery itself over more conservative treatments would appear to remain in doubt, particularly when considering variables such as age and activity level.  *See, e.g.*, Casey Tingle, *Older Patients Experience Worse Outcomes Following Hip Arthroscopy for FAI*, http://www.healio.com/orthopedics/arthroscopy/news/online/%7Bc39239e    3-3d4a-405b-879f-2bfbf0ec7968%7D/older-patients-experience-worse-outcomes-following-hip-arthroscopy-for-fai (last visited Nov. 18, 2015) (reporting presenter's findings that patients over 45 years of age who underwent hip arthroscopy for FAI experienced worse outcomes than younger patients); Laura E. Diamond et al., *Physical Impairments and Activity Limitations in People with Femoroacetabular Impingement: A Systematic Review*, 49 Brit. J. Sports Med. 230 (2015), http://bjsm.bmj.com/content/49/4/230.full ("The long-term clinical results of surgery for FAI, and the role of non-surgical interventions such as rehabilitation and exercise programmes, have not been established."); Khaled Emara et al., *Conservative Treatment for Mild Femoroacetabular Impingement*, 19 J. Orthopaedic Surgery 41, 45 (2011), www.josonline.org/pdf/v19i1p41.pdf ("Conservative treatment for FAI achieved good early results so long as the patients [could] modify activities of daily living to adapt to their hip morphology.").

fees against the offending parties would deter other persons acting under similar circumstances; 4) the amount of benefit conferred on members of the pension plan as a whole; and 5) the relative merits of the parties' positions." *Id*.  Under the second test, the court asks "whether or not the losing party's position was substantially justified." *Id.* at 506 (internal quotation marks omitted).  Ultimately, both tests are directed to a larger question:  whether the losing party meant to harass the opposing party or had a position that was "substantially justified and taken in good faith." *Id*.  A losing party's position is substantially justified when it is such that it "could satisfy a reasonable person." *Id*.

Particularly when focusing on this central concern, the court finds that defendant is *not* entitled to fees and costs.  Plaintiffs only filed this action after making an effort to respond in good faith to each of Aetna's denial of appeal notices.  While the court ultimately held that Aetna reasonably determined the medical procedure underlying plaintiffs' claims was not eligible for coverage, at least at the time performed, plaintiffs' contrary position was far from frivolous.

Moreover, Aetna's handling of plaintiffs' administrative appeals was not so exemplary so as to be unassailable.  The record suggests that Aetna:  (1) relied on two different versions of the relevant CPB in evaluating plaintiff's claims; (2) was inconsistent in explaining why it found Ms. Barone ineligible for coverage; and (3) denied plaintiffs' claims on the basis that they did not demonstrate a diagnosis of definite FAI, despite having no evidence contradicting that very diagnosis by Barone's treating physicians. Accordingly, factors one, three and five under the first test weigh strongly against awarding fees and costs to defendant, and only factor two weighs in favor.  Likewise, the

second test compels a finding that plaintiffs had viable reasons to challenge Aetna's denial.   Overall, the court also concludes that plaintiffs' claim for coverage was substantially justified and taken in good faith. Consequently, the court will not award fees or costs to defendant.

ORDER

IT IS ORDERED that:

(1) plaintiffs' motion for summary judgment (dkt. #26) is DENIED;

(2) defendant's motion for summary judgment (dkt. #30) is GRANTED IN PART and DENIED IN PART, consistent with this opinion; and

(3) the clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered this 18th day of November, 2015.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge